**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| DOUG BOND, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>UWM HOLDINGS CORPORATION, MATHEW ISHBIA, and RAMI HASANI,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Doug Bond ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by UWM Holdings Corporation ("UWM" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by UWM; and (c) review of other publicly available information concerning UWM.

**<u>NATURE OF THE ACTION AND OVERVIEW</u>**

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired UWM securities between March 9, 2026 and August 5, 2026, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      UWM engages in the origination, sale, and servicing of residential mortgage loans in the United States.

3.      In December 2025, UWM and Two Harbors Investment Corp. ("Two Harbors") (owner of RoundPoint Mortgage Servicing) signed an all-stock merger agreement valued at $1.3 billion to expand UWM's mortgage servicing rights (MSRs). However, in March 2026, Two Harbors terminated the UWM agreement after CrossCountry Mortgage stepped in with a competing cash offer and agreed to pay UWM's termination fee. UWM aggressively countered by raising its proposals, but Two Harbors' board repeatedly rebuffed these advances, leading to a brief mandated negotiation waiver period in June 2026 that expired without a new deal.

4.      On August 5, 2026, after the market closed, UWM reported second quarter fiscal year 2026 financial results, including a ***$603.2 million interest rate derivatives loss*** which

1

contributed to a ***$451.9 million second-quarter net loss***. Total equity also ***fell 43.6%*** year over year, reflecting the net loss and derivative-related charges.

5. Then, on August 6, 2026, at 10:30 AM EDT, the Company held an earnings call in connection with its second quarter 2026 financial results. During that call, Chief Executive Officer Mathew Ishbia ("Ishbia") disclosed "***We were over-hedged***, if you think of it that way, protecting against the Two Harbors transaction." Ishbia further stated "***[w]e don't traditionally hedge our MSRs*** [Mortgage Servicing Rights]" but "when you're going through and acquiring a company like Two Harbors and a massive MSR book… it created a little more risk. ***So . . . we did put a hedge on to protect against that risk and then a lot of things happen[ed]…and then obviously, the Two Harbors transaction went away***. And so a confluence of events that created a hedge loss."

6. On this news, shares of UWM Holdings fell $0.64 or 34.78% to close at $1.20 on August 6, 2026, on unusually heavy trading volume.

7. Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company had deviated from its traditional strategy of not hedging its mortgage servicing rights to take a major hedge position; (2) the Company over-hedged itself in anticipation of the Two Harbors transaction; (3) the Company's purported efforts to balance its risk in fact created an excess hedging risk; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are in this District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff Doug Bond, as set forth in the accompanying certification, incorporated by reference herein, purchased UWM securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14. Defendant UWM is incorporated under the laws of Delaware with its principal executive offices located in Pontiac, Michigan. UWM's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "UWMC."

15. Defendant Ishbia was the Company's Chief Executive Officer ("CEO") at all relevant times.

16. Defendant Rami Hasani ("Hasani") was the Company's Chief Financial Officer ("CFO") at all relevant times.

17. Defendants Ishbia and Hasani (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

<b><u>SUBSTANTIVE ALLEGATIONS</u></b>

<b><u>Background</u></b>

18. UWM engages in the origination, sale, and servicing of residential mortgage loans in the United States.

19. In December 2025, UWM and Two Harbors (owner of RoundPoint Mortgage Servicing) signed an all-stock merger agreement valued at $1.3 billion to expand UWM's mortgage

4

servicing rights (MSRs). However, in March 2026, Two Harbors terminated the UWM agreement after CrossCountry Mortgage stepped in with a competing cash offer and agreed to pay UWM's termination fee. UWM aggressively countered by raising its proposals, but Two Harbors' board repeatedly rebuffed these advances, leading to a brief mandated negotiation waiver period in June 2026 that expired without a new deal.

**Materially False and Misleading**

**<u>Statements Issued During the Class Period</u>**

20.     The Class Period begins on March 9, 2026. On that day, UWM issued a press release in advance of the upcoming stockholder meeting of Two Harbors to announce "additional insight into its anticipated business results for the 2026 fiscal year." In the press release, the Company assured *[e]ven without the Two Harbors transaction" that the Company expects total revenue for fiscal year 2026 "to be between $3.5 billion and $4.5 billion."* Specifically, the press release stated as follows, in relevant part:

> PONTIAC, Mich.--(BUSINESS WIRE)-- **UWM Holdings Corporation (NYSE: UWMC)** ("UWMC" or the "Company"), the publicly traded indirect parent of United Wholesale Mortgage ("UWM"), the #1 overall mortgage lender in America, provides an update on its forecast in advance of the upcoming stockholder meeting of Two Harbors Investment Corp. (NYSE: TWO) ("Two Harbors"). To provide greater insight into the market, UWMC is updating its outlook for first-quarter total revenue as well as additional insight into its anticipated business results for the 2026 fiscal year.
>
> Mat Ishbia, Chairman, President, and CEO of UWM, said, "Upon further evaluation, we believe it is important to provide an update on our outlook for Q1 and for fiscal year 2026. UWM's total loan origination volume was $49.6 billion for the fourth quarter of 2025, which represents its highest quarterly origination volume since 2021. ***Additionally, our core business fundamentals remain very strong. Even without the Two Harbors transaction, we now expect our total revenue for the first quarter of 2026 to be between $800 million and $900 million, and for fiscal year 2026 to be between $3.5 billion and $4.5 billion.*** Further, our investments in AI are now implemented and working in multiple areas to make our team members materially more efficient. As such, we remain confident in handling two to three times our current volume while avoiding the need to replace team members who depart through natural attrition. We expect Mia, our voice-enabled

5

AI assistant, to handle over 12 million inbound and outbound calls this year, and the success of this initiative is evident from recent industry information indicating that UWM continues to originate approximately 12% of all refinances and remains the largest originator of purchase loans in the country. ***Lastly, we expect to demonstrate the favorable results of our investments in people and technology over the last three years, as we are ahead of pace to achieve an annualized nine figure run rate in revenue from new products and services, like TRAC+ and PA+."***

UWMC remains excited about the strategic merits and long-term value-creation potential of our proposed acquisition of Two Harbors and continues to urge Two Harbors stockholders, as the Two Harbors Board recommends, to vote in favor of the transaction at the upcoming shareholder meeting.

21. On May 6, 2026, UWM issued a press release announcing its results for the first quarter ended March 31, 2026. The press release purported to report the Company's financial results, including as follows, in relevant part:

Mat Ishbia, Chairman, Chief Executive Officer and President of UWMC, said, *"Q1 was an exceptional quarter for UWM and our second-best first quarter of all time. The last time we delivered results of this magnitude, interest rates were nearly 50% lower, which underscores the strength, scale and resilience of our business. Our team and broker partners executed at the highest level, using UWM's proprietary technology and AI-powered tools like Mia to win more loans, more efficiently, every day. We continue to move ahead of schedule with bringing servicing in-house, and regardless of whether rates stay higher or move lower, we are positioned to keep winning as we are built to perform through all cycles. This quarter is a clear proof point of that."*

*                         *                         *

**Production and Income Statement Highlights** (dollars in thousands, except per share amounts)

|  | Q1 2026 | Q4 2025 | Q1 2025 |
|---|---|---|---|
| Loan origination volume[1] | $ 44,944,156 | $ 49,608,104 | $ 32,351,776 |
| Total gain margin[1][2] | 1.23% | 1.22% | 0.94% |
| Total revenue | $ 901,427 | $ 945,247 | $ 613,370 |
| Net income (loss) | 170,374 | 164,484 | (247,028) |
| Diluted earnings (loss) per share | 0.09 | 0.08 | (0.12) |
| Adjusted diluted earnings per share[3] | N/A | 0.08 | N/A |
| Adjusted net income (loss) [3] | 137,154 | 130,561 | (195,300) |
| Adjusted EBITDA[3] | 160,909 | 232,778 | 57,803 |

(1) Key operational metric (see discussion below)
(2) Represents total loan production income divided by loan origination volume
(3) Non-GAAP metric (see discussion and reconciliations below)

**Balance Sheet Highlights as of Period-end** (dollars in thousands)

|  | Q1 2026 | Q4 2025 | Q1 2025 |
|---|---|---|---|
| Cash and cash equivalents | $ 423,996 | $ 503,364 | $ 485,024 |
| Mortgage loans at fair value | 10,991,101 | 9,932,729 | 8,402,211 |
| Mortgage servicing rights | 4,591,855 | 4,073,781 | 3,321,457 |
| Total assets | 19,266,244 | 16,928,676 | 14,048,433 |
| Non-funding debt [1] | 5,092,831 | 4,292,940 | 3,149,687 |
| Total equity | 1,600,901 | 1,593,629 | 1,635,349 |
| Non-funding debt to equity [1] | 3.18 | 2.69 | 1.93 |

(1) Non-GAAP metric (see discussion and reconciliations below)

*                         *                         *

|  | March 31, 2026 | December 31, 2025 |
|---|---|---|
| **Assets** | (Unaudited) | |
| Cash and cash equivalents (includes restricted cash of $21.0 million and $16.0 million, respectively) | $ 423,996 | $ 503,364 |
| Mortgage loans at fair value | 10,991,101 | 9,932,729 |
| Derivative assets | 124,490 | 37,567 |
| Investment securities at fair value, pledged | 98,491 | 100,512 |
| Accounts receivable, net | 1,271,014 | 526,694 |
| Mortgage servicing rights | 4,591,855 | 4,073,781 |
| Premises and equipment, net | 180,523 | 180,199 |
| Operating lease right-of-use asset (includes $91.8 million and $93.4 million with related parties) | 92,616 | 94,310 |
| Finance lease right-of-use asset, net (includes $20.2 million and $20.7 million with related parties) | 20,681 | 21,247 |
| Loans eligible for repurchase from Ginnie Mae | 1,124,020 | 1,133,359 |
| Other assets | 347,457 | 324,914 |
| **Total assets** | $ 19,266,244 | $ 16,928,676 |
| **Liabilities and Equity** | | |
| Warehouse lines of credit | $ 9,900,303 | $ 8,912,496 |
| Derivative liabilities | 337,817 | 26,574 |
| Secured line of credit | 2,000,000 | 1,200,000 |
| Borrowings against investment securities | 86,724 | 87,497 |
| Accounts payable, accrued expenses and other | 949,788 | 707,790 |
| Accrued distributions and dividends payable | 161,773 | 161,292 |
| Senior notes | 2,983,152 | 2,981,975 |
| Operating lease liability (includes $98.0 million and $99.7 million with related parties) | 98,811 | 100,596 |
| Finance lease liability (includes $22.4 million and $22.9 million with related parties) | 22,955 | 23,468 |
| Loans eligible for repurchase from Ginnie Mae | 1,124,020 | 1,133,359 |
| **Total liabilities** | 17,665,343 | 15,335,047 |

7

22.     On May 11, 2026, the Company filed its quarterly report for the period ended March 31, 2026 on Form 10-Q with the SEC (the "1Q26 10-Q"). The 1Q26 10-Q affirmed the previously reported financial results. The 1Q26 10-Q further stated the following regarding derivatives and risk hedging activities, as follows in relevant part:

NOTE 3 – DERIVATIVES

The Company enters into interest rate lock commitments ("IRLCs") to originate residential mortgage loans at specified interest rates and terms within a specified period of time with customers who have applied for a loan and may meet certain credit and underwriting criteria. To determine the fair value of the IRLCs, each contract is evaluated based upon its stage in the application, approval and origination process for its likelihood of consummating the transaction (or "pullthrough"). Pullthrough is estimated based on changes in market conditions, loan stage, and actual borrower behavior using a historical analysis of IRLC closing rates. Generally, the further into the process the more likely that the IRLC will convert to a loan. The blended average pullthrough rate was 81% and 78% as of March 31, 2026 and December 31, 2025, respectively. The Company primarily uses forward loan sale commitments ("FLSCs") to economically hedge its pipeline of IRLCs and mortgage loans at fair value. ***From time to time, the Company enters into other interest rate derivatives as part of its overall interest rate risk mitigation strategy. These other derivative financial instruments are measured at estimated fair value with changes in fair value recorded in the condensed consolidated statements of operations within the "Gain (loss) on other interest rate derivatives" line item in the "Other gains (losses), net" section.***

The notional amounts and fair values of derivative financial instruments not designated as hedging instruments were as follows (in thousands):

| | March 31, 2026 | | | December 31, 2025 | | |
| | Fair value | | | Fair value | | |
| | Derivative assets | Derivative liabilities | Notional Amount | Derivative assets | Derivative liabilities | Notional Amount |
|---|---|---|---|---|---|---|
| IRLCs | $ 16,456 | $ 35,280 | $ 11,530,889 (a) | $ 27,780 | $ 6,475 | $ 12,221,203 (a) |
| FLSCs | 108,034 | 14,442 | 19,680,278 | 9,787 | 20,099 | 16,964,025 |
| Other interest rate derivatives | — | 288,095 | 27,500,000 | — | — | — |
| Total | $ 124,490 | $ 337,817 | | $ 37,567 | $ 26,574 | |

\*          \*          \*

**Interest rate lock commitments, loan sale and forward commitments, and other interest rate derivatives**

8

In the normal course of business, we are party to financial instruments with off-balance sheet risk. These financial instruments include commitments to extend credit to borrowers at either fixed or floating interest rates. IRLCs are binding agreements to lend to a borrower at a specified interest rate within a specified period of time as long as there is no violation of conditions established in the contract. These commitments generally have fixed expiration dates or other termination clauses which may require payment of a fee. As many of these commitments expire without being drawn upon, the total commitment amounts do not necessarily represent future cash requirements. The blended average pullthrough rate was 81% and 78% as of March 31, 2026 and December 31, 2025, respectively.

We also enter into contracts to sell loans into the secondary market at specified future dates (commitments to sell loans), and forward commitments to sell MBS at specified future dates and interest rates. We also occasionally enter into other interest rate derivatives as part of our overall interest rate mitigation strategy for MSRs, including interest rate swap futures, treasury futures, and forward loan purchase commitments. These financial instruments include margin call provisions that require us to transfer cash in an amount sufficient to eliminate any margin deficit. A margin deficit generally results from daily changes in the fair value of these financial instruments. We are generally required to satisfy the margin call on the day of or within one business day of such notice.

Following is a summary of the notional amounts of commitments as of dates indicated:

| ($ in thousands) | March 31, 2026 | December 31, 2025 |
|---|---|---|
| Interest rate lock commitments—fixed rate (a) | $ 10,995,424 | $ 11,770,855 |
| Interest rate lock commitments—variable rate (a) | 535,465 | 450,348 |
| Commitments to sell loans | 2,487,714 | 2,608,946 |
| Forward commitments to sell mortgage-backed securities | 17,192,564 | 14,355,079 |
| Other interest rate derivatives | 27,500,000 | — |

23.     The 1Q26 10-Q purported to warn of risks that "*could*" or "*may*" negatively impact the Company, including those risks related to the Company's risk mitigation hedging activities, as follows in relevant part:

*Interest rate risk*

We are subject to interest rate risk which may impact our origination volume and associated revenue, MSR valuations, IRLCs and mortgage loans at fair value valuations, and the net interest margin derived from our funding facilities. The fair value of MSRs is driven primarily by interest rates, which impact expected

9

prepayments. In periods of rising interest rates, the fair value of the MSRs generally increases as expected prepayments decrease, consequently extending the estimated life of the MSRs, and estimated float earnings increase, resulting in expected increases in cash flows. In a declining interest rate environment, the fair value of MSRs generally decreases as expected prepayments increase consequently truncating the estimated life of the MSRs, and estimated float earnings decrease, resulting in expected decreases in cash flows. Loan origination volumes tend to increase in declining interest rate environments and decrease in increasing rate environments, therefore we believe that our origination business provides a natural hedge to servicing. We periodically evaluate our overall interest rate risk management strategy with respect to MSRs, which includes consideration of our natural business model hedge, regular sales of MSRs and excess servicing cash flows, and at times entering into other interest rate derivatives to mitigate the interest rate risk associated with all or a portion of our MSR portfolio.

*    *    *

We assess our market risk based on changes in interest rates utilizing a sensitivity analysis. The sensitivity analysis measures the potential impact on fair values based on hypothetical changes (increases and decreases) in interest rates. Our total market risk is influenced by a wide variety of factors including market volatility and the liquidity of the markets. There are certain limitations inherent in the sensitivity analysis presented, including the necessity to conduct the analysis based on a single point in time and the inability to include the complex market reactions that normally would arise from the market shifts modeled. We used March 31, 2026 market rates on our instruments outstanding at that time to perform the sensitivity analysis. These sensitivities are hypothetical and presented for illustrative purposes only. Changes in fair value based on variations in assumptions generally cannot be extrapolated to our performance because the relationship of the change in fair value may not be linear nor does it factor ongoing operations. The following table summarizes the estimated change in the fair value of our mortgage loans at fair value, MSRs, IRLCs, FLSCs, and other interest rate derivatives as of March 31, 2026 given hypothetical instantaneous parallel shifts in the yield curve. Actual results could differ materially.

24. The above statements identified in ¶¶20-23 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) the Company had deviated from its traditional strategy of not hedging its mortgage servicing rights to take a major hedge position; (2) the Company over-hedged itself in anticipation of the Two Harbors transaction; (3) the Company's purported efforts to balance its risk in fact created an excess hedging risk; and (4)

10

that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

### Disclosures at the End of the Class Period

25.     On August 5, 2026, after the market closed, UWM reported second quarter fiscal year 2026 financial results, including a ***$603.2 million interest rate derivatives loss*** which contributed to a ***$451.9 million second-quarter net loss***. Total equity also ***fell 43.6%*** year over year, reflecting the net loss and derivative-related charges.

26.     Then, on August 6, 2026, at 10:30 AM EDT, the Company held an earnings call in connection with its second quarter 2026 financial results. During that call, CEO Ishbia disclosed "***We were over-hedged***, if you think of it that way, protecting against the Two Harbors transaction." Ishbia further stated "***[w]e don't traditionally hedge our MSRs*** [Mortgage Servicing Rights]" but "when you're going through and acquiring a company like Two Harbors and a massive MSR book… it created a little more risk. ***So . . . we did put a hedge on to protect against that risk and then a lot of things happen[ed]…and then obviously, the Two Harbors transaction went away***. And so a confluence of events that created a hedge loss." Specifically, Ishbia stated as follows, in relevant part:

> So listen, hedging in general in the mortgage industry is expensive. And ***it's something I actually don't believe in, in general.*** We have never hedged our MSR, I say never. We don't traditionally hedge our MSRs. Our origination machine is so big and strong that if the rates drop, you'll lose MSR value and equity, but you'll do so much more business that you're good. And if rates go up, your MSR values go up and you do less originations, but your equity goes up. That's kind of how we've always played it.
>
> ***Well, when you're going through and acquiring a company like Two Harbors and a massive MSR book, then our MSR book became double the size of what we've always managed. And therefore, it created a little more risk. So when we did put a hedge on to protect against that risk and then a lot of things happen.***
>
> Let's just be real with whether it's a war, a lot of different things that happened that created the 10-year to go up -- and then obviously, ***the Two Harbors transaction***

*went away. And so a confluence of events that created a hedge loss.* We hit a certain risk threshold that I said we're not going to continue hedging regardless because we didn't want to have more of an equity drain, and we took the hedge off. And of course, *that's the strategy that we've always had is let's not hedge,* let's run the business effectively.

Once again, Oaktree has a strategic perspective on this, and I'll go through that with them after this process and whether we hedge going forward or not. But once you have $3 billion of equity, you're really not at a risk of the MSR values go down $400 million for this quarter or go up $400 million, it's less relevant. But when you're hovering around $1.5 billion or $2 billion, it becomes a little bit more relevant. And so that became an issue. *We hedged -- and it was a onetime event, to be honest with you, because of Two Harbors, we were overhedged, if you think of it that way, protecting against the Two Harbors transaction.* The market moved against us, and it's a onetime event that won't happen again. We feel like our hedging policies are much stronger now, but also we're not acquiring another company that has an MSR book like that, at least that's not the plan of now, and we know how to handle it differently going forward.

27. On this news, shares of UWM Holdings fell $0.64 or 34.78% to close at $1.20 on August 6, 2026, on unusually heavy trading volume.

## CLASS ACTION ALLEGATIONS

28. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired UWM securities between March 9, 2026 and August 5, 2026, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, UWM's shares actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members

12

in the proposed Class.  Millions of UWM shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by UWM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of UWM; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

33.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## **UNDISCLOSED ADVERSE FACTS**

34.     The market for UWM's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, UWM's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired UWM's securities relying upon the integrity of the market price of the Company's securities and market information relating to UWM, and have been damaged thereby.

35.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of UWM's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about UWM's business, operations, and prospects as alleged herein.

36.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about UWM's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class

14

purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38. During the Class Period, Plaintiff and the Class purchased UWM's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding UWM, their control over, and/or receipt and/or modification of UWM's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning UWM, participated in the fraudulent scheme alleged herein.

15

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD-ON-THE-MARKET DOCTRINE)

40.     The market for UWM's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, UWM's securities traded at artificially inflated prices during the Class Period.  On March 10, 2026, the Company's share price closed at a Class Period high of $4.04 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of UWM's securities and market information relating to UWM, and have been damaged thereby.

41.     During the Class Period, the artificial inflation of UWM's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about UWM's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of UWM and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42.     At all relevant times, the market for UWM's securities was an efficient market for the following reasons, among others:

(a)     UWM shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

16

(b) As a regulated issuer, UWM filed periodic public reports with the SEC and/or the NYSE;

(c) UWM regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) UWM was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43. As a result of the foregoing, the market for UWM's securities promptly digested current information regarding UWM from all publicly available sources and reflected such information in UWM's share price. Under these circumstances, all purchasers of UWM's securities during the Class Period suffered similar injury through their purchase of UWM's securities at artificially inflated prices and a presumption of reliance applies.

44. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the

17

importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

45. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of UWM who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

46. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

47. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase UWM's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

48.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for UWM's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about UWM's financial well-being and prospects, as specified herein.

50.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of UWM's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about UWM and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly

19

herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

51.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

52.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing UWM's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain

20

such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of UWM's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired UWM's securities during the Class Period at artificially high prices and were damaged thereby.

54. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that UWM was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their UWM securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

57.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.     Individual Defendants acted as controlling persons of UWM within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, UWM and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members

22

of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)      Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  August 13, 2026

**ANTHONY L. DELUCA, PLC**

By:  *Anthony L. DeLuca*
Anthony L. DeLuca (P64874)
Grand Marais Professional Centre
14950 East Jefferson Avenue, Suite 170
Grosse Pointe Park, MI 48230
Telephone: (313) 821-5905
Facsimile: (313) 821-5906
Email: anthony@aldplc.com

**GLANCY PRONGAY WOLKE & ROTTER LLP**
Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: clinehan@glancylaw.com

Rebecca Dawson
745 5th Avenue, 5th Floor
New York, NY 10151
Telephone: (213) 521-8007
Facsimile: (212) 884-0988
Email:  rdawson@glancylaw.com

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

*Counsel for Plaintiff Doug Bond*

24